THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THERMAN WALKER, Defendant-Appellant.

First District (2nd Division)   No. 1—89—2847

Opinion filed March 31, 1992.—Rehearing denied May 6, 1992.

Randolph N. Stone, Public Defender, of Chicago (Beth I. Solomon and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore Burtzos, Marie Quinlivan Czech, and Jeanne Lobelson, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Therman Walker, appeals his conviction by a jury on three counts of armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)), and his three concurrent life sentences as an habitual criminal (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1). On appeal he questions whether (1) the circuit court erred in denying his motion to suppress evidence due to an improper inventory search; (2) the State violated *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (*Batson*), by exercising peremptory challenges based upon race; (3) the court and the State made improper remarks before and during trial; and (4) there was insufficient evidence to support his sentencing as an habitual criminal.

During a hearing on defendant's motion to quash arrest and suppress evidence, the following evidence was adduced.

Defendant testified that on August 5, 1987, he was driving his brother's 1978 Oldsmobile, looking for a friend's house in Harvey, Illinois. Sidney Carver was his passenger. Defendant pulled the car off the road, turned out the headlights and exited the car to look at addresses. An unmarked police car pulled in front of him. Police officers alighted, threw him against the car and asked him where he was going. A search of defendant produced a pistol. Defendant and Carver were arrested and taken to a police station.

Dixmoor Detective Sergeant Michael R. Morgan testified that he was with his partner, Officer Terry Price, watching local drug houses, when he observed the vehicle driven by defendant fail to stop at a stop sign. The police followed and next saw that the automobile was parked, its lights extinguished, blocking traffic. Sgt. Morgan saw defendant leave and walk away from the vehicle. He drove his vehicle so as to block defendant's path.

Officer Price left his vehicle and spoke to defendant, while Sgt. Morgan approached him from behind. Sgt. Morgan noticed the butt of a gun in defendant's pocket. As defendant reached for the gun, Sgt. Morgan grabbed him and the outside of the gun pocket, pushed him against the side of the automobile, took his gun, handcuffed him and placed him in the back of the police car. He and Officer Price ordered Carver out of the car, checked him for weapons, and placed him in another officer's vehicle to be driven to the police station. He instructed Officer Price to drive defendant's vehicle to the same station in Dixmoor. He drove defendant to the Dixmoor station in the squad car.

There was no storage facility for autos at the Dixmoor police station and defendant's vehicle would have to be transferred to a private facility, according to Sgt. Morgan. Preparatory procedures required that, before transfer, the vehicle must be searched for valuables; these are inventoried and held for safekeeping by the police to be returned to the owner. At the station the officers conducted such an inventory search on defendant's vehicle, before sending it to private storage. Sgt. Morgan found a "flowered bag" containing a sawed-off shotgun, shells and gloves, under the driver's seat. The serial numbers and manufacturer's name were filed off the shotgun. In the trunk, Officer Price found some clothes and identification and credit cards in one of the jacket pockets. The cards were not in defendant's or Carver's name. Upon contacting the owners, Sgt. Morgan was informed those items were taken during an armed robbery in Chicago. Sgt. Morgan then contacted Chicago police and defendant was transferred to the Chicago police department for lineup purposes.

At the Chicago police lineup, defendant was identified as one of two men who committed an armed robbery in Chicago on July 24, 1987. He was indicted by a grand jury on three counts of armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)). Defendant requested a jury trial.

Following argument at the suppression hearing, defendant's motion was denied. The circuit court found, based on the evidence, that defendant was properly arrested on a weapons charge; movement of defendant's vehicle from the street to impoundment was proper; and the inventory search incident to impoundment was reasonable. The case proceeded to trial.

At trial, Michael Memmer testified that on July 24, 1987, he was working along with Michael Hogan at a retail shop in Chicago. Two customers were present at approximately 3:15 p.m., when defendant entered the store with Carver. Defendant approached him and asked to buy an item. When Memmer opened the cash register, defendant put a gun in his side and walked him to the back of the store. Memmer and Randy Evans, a customer, were ordered to lie on the floor. Carver, carrying a shotgun, directed Hogan and another customer to the same area. They were instructed to turn over their wallets; one customer was told to relinquish her handbag. Hogan and Evans surrendered their wallets; Memmer gave up his money. After the perpetrators left, Memmer called the police, at which point he noticed the cash register was emptied of about $200. He identified the shotgun and pistol as the weapons used by defendant and Carver, which were the same firearms confiscated by Dixmoor police during the inventory

search of the auto. Memmer testified that he had identified defendant in a Chicago police lineup and he identified defendant in court as the same person.

Evans and Hogan substantially corroborated Memmer's testimony. They identified the cards and identification taken from them and recovered by Dixmoor police from the auto. Hogan identified the shotgun used by Carver. Evans related that he identified defendant at a lineup and identified him in court as well.

Sgt. Morgan identified at trial the items taken and the weapons used during the robbery as those found on defendant's person and in the car defendant was driving the night of the arrest. His testimony at trial tracked his description of events previously asserted at the suppression hearing, which were corroborated by Officer Price. Officer Price also identified the shotgun used by Carver and Hogan's and Evans' belongings as being recovered from the automobile the night of the arrest. Both officers identified defendant in court.

Chicago police officer Andrew Sobolewski, who transported defendant from Dixmoor to Chicago police headquarters, asserted he was present when Memmer and Evans identified defendant in a lineup. He further identified defendant in court.

Defendant's motion for a directed verdict at the close of the State's case in chief was denied. Defendant's wife testified as defendant's only witness and reported that his brother, Lawrence, owned a 1978 Oldsmobile.

This appeal proceeds from the jury verdict and sentencing first noted.

### I

Defendant initially urges that his vehicle was not lawfully impounded and the subsequent search was improper; therefore, the circuit court improperly denied his motion to suppress.

■ The circuit court found that the two officers approached defendant because he failed to stop at a stop sign; as one officer engaged in conversation with defendant, the other recovered a pistol partly visible in defendant's right-hand pants pocket; and, at that point, the police had probable cause to arrest defendant for unlawful use of a weapon. The court further found that moving the automobile from the scene was reasonable because defendant and Carver were in custody and leaving the car where it was would have created a traffic hazard. This finding was supported by Sgt. Morgan's testimony that the car was blocking traffic and photographs of the road at the court's disposal. Police have authority to seize and remove from the

roadway vehicles impeding traffic and threatening public safety. (*People v. Schultz* (1981), 93 Ill. App. 3d 1071, 1076, 418 N.E.2d 6.) The decision of the circuit court in this context will not be disturbed unless it is manifestly erroneous. (*People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898.) The court's finding here that the car was properly impounded was not manifestly erroneous.

Defendant nevertheless asserts that police were required and failed to use less intrusive alternatives, such as giving the car to Carver or asking defendant if he could make other arrangements, citing *People v. Velleff* (1981), 94 Ill. App. 3d 820, 419 N.E.2d 89, and *People v. Valdez* (1980), 81 Ill. App. 3d 25, 400 N.E.2d 1096.

In *Velleff*, the court found the police did not have a right to take custody of defendant's automobile because less intrusive alternatives were available (*Velleff*, 94 Ill. App. 3d at 823-24); however, there was no indication that the car in *Velleff* was creating a traffic hazard, as here. In *Valdez*, the court found the police had no authority to remove a vehicle, for the automobile was in a private parking lot, rather than obstructing a public road as in the present situation. (*Valdez*, 81 Ill. App. 3d at 29.) Neither case has application to these facts.

Defendant insists that the inventory search was not conducted pursuant to standard procedures and left too much discretion to the officers. Sgt. Morgan, while conducting the search, found a flowered bag on the driver's side of the car under the seat. Upon holding the bag, he felt a trigger guard and the butt of a sawed-off shotgun; he opened the bag and found a shotgun, three shells and a pair of rubber gloves. A search of the trunk revealed, in a jacket pocket, the identification and credit cards previously mentioned. Defendant maintains the opening of the bag and searching of the jacket pocket violated defendant's fourth amendment rights.

Two purposes of an inventory search are to safeguard a defendant's property while in police custody and to guard police from danger. (*South Dakota v. Opperman* (1976), 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092.) In addition, it is clear that such a search would also deter the lodging of unfounded claims for property alleged to be missing. The search must be conducted pursuant to standard procedures, standardized criteria or established routine in order to prevent the inventory search from becoming a ruse for a general rummaging in the pursuit of incriminating evidence. *Florida v. Wells* (1990), 495 U.S. 1, 109 L. Ed. 2d 1, 110 S. Ct. 1632.

Here, Sgt. Morgan testified that looking into jacket pockets in order to search for valuables was in accord with procedure, although no policy had been articulated allowing a search of containers

in a car. (*Wells*, 495 U.S. at 4-5, 109 L. Ed. 2d at 8, 110 S. Ct. at 1635; *People v. Lear* (1991), 217 Ill. App. 3d 712, 577 N.E.2d 826.) Nevertheless, once the officer held the bag taken from under the driver's seat, he became aware that it contained a weapon, having felt a trigger guard and the butt of a sawed-off shotgun. Contrary to defendant's urgings, this is unlike *Lear*, where the court prohibited the opening of a bag when there was no policy to do so and no indication as to why the officer thought or how certain the officer was that the bag contained a weapon. Here, the officer had substantial reason to believe that the bag contained a weapon. The officer opened the bag to protect his safety or that of those who may be harmed by the eventual use of the weapon. He also was aware that another car was previously broken into at the pound, the subject vehicle's eventual destination. *Opperman*, 428 U.S. at 373-75, 49 L. Ed. 2d at 1007-08, 96 S. Ct. at 3099-3100.

The court's findings with respect to the suppression motion were not manifestly erroneous.

## II

Defendant next claims the State used its peremptory challenges to exclude jurors on the basis of race. During *voir dire*, the State exercised five peremptory challenges; four were used against black prospective jurors. The circuit court found that a *prima facie* case existed, sufficient to question whether the State had used its challenges to exclude blacks from the jury.

Once a defendant has established a *prima facie* case of discrimination, the burden shifts to the State to provide a race-neutral explanation for each peremptory challenge to which an objection was lodged. The explanations must be clear, reasonably specific, legitimate and nonracial. (*People v. Kindelan* (1991), 213 Ill. App. 3d 548, 555, 572 N.E.2d 1138.) The circuit court's determination will not be set aside unless it is against the manifest weight of the evidence. Since this determination is based upon credibility, the circuit court's ruling is given great deference. *Kindelan*, 213 Ill. App. 3d at 555.

The State asserted that one black prospective juror was excluded because he was previously arrested and charged with armed robbery. A second such juror was excused when she hesitated upon being asked whether she could be fair to both sides, as also noted by the court; she never had been a crime victim. The third juror was excused by the State because her demeanor indicated a lack of honesty. The State excused the final black prospective juror, a free-lance journalist, because it believed she would not have an open mind, but

would gather facts to write a story, rather than giving her full attention to the case; further, she was never a crime victim. After hearing these explanations, the court concluded the exclusions were not race-based, stating that the reasons given could be "absolutely specious," dumb and stupid as long as they are not race-based. The court scrutinized the reasons given for the exclusion of each juror and was convinced they were legitimate and not race-based. (*Kindelan*, 213 Ill. App. 3d at 555.) Defendant contends, as in *Kindelan*, the State lacked the information its reasoning was based upon. In *Kindelan*, however, the State lacked pertinent information and the court did not scrutinize the State's explanations, neither of which circumstances existed here.

Defendant also contends the reasons given were not sufficient because several of the accepted jurors had some of the same qualities given for the exclusions: they were never victimized by a crime, and two did not own their homes. The court was in the best position to make this determination; further, these were not the sole reasons given for excluding the potential jurors. The court's findings were not against the manifest weight of the evidence.

### III

Denial of a fair trial by reason of the circuit court's alleged display of animosity toward defense counsel and the State's improper closing argument is the basis for defendant's next point of error.

■ Defendant initially points to two remarks by the court, one informing defense counsel he already had his chance to respond and to refrain from debating with the court, and the second, stating the court's observations as to the jury selection process. Both were spoken outside the presence of the jury and, therefore, could not have affected the verdict.

Several other comments by the circuit court were directed toward defense counsel in the presence of the jury. No objection to them was made at trial, however. Due to the practical difficulties inherent in objecting to the conduct of a judge, this issue is not waived. (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936, 449 N.E.2d 568.) Comments by a court do not require reversal unless they are prejudicial and harm defendant. The verdict will not be disturbed unless the court's remarks constitute a material factor in the conviction or unless prejudice to defendant appears to be their probable result. (*Heidorn*, 114 Ill. App. 3d at 937.) Further, a proper jury instruction may reduce the prejudicial effect. *Heidorn*, 114 Ill. App. 3d at 938.

Each comment by the court objected to by defendant here was related to the court's ability to ensure that the proceedings follow in a dignified and orderly fashion (*People v. Griffin* (1990), 194 Ill. App. 3d 286, 294, 550 N.E.2d 1244), or to the court's wide discretion in conducting a trial (*Heidorn*, 114 Ill. App. 3d at 936). These comments were directed, in part, to defense counsel's disobedience of the court's previous rulings; they did not belittle or attack counsel. Additionally, the jury was instructed that neither by the instructions nor by ruling or remark which the court made did it mean to indicate any opinion as to the facts or as to what the verdict should be. This instruction reduced any potentially prejudicial effect. *Heidorn*, 114 Ill. App. 3d at 938.

■ Defendant maintains also that the State's closing arguments denied him a fair trial, claiming they were made to convince the jury that defendant had a propensity to commit crimes, to diminish defendant's presumption of innocence and to impugn defense counsel's integrity.

Defendant failed to object to all but one comment, regarding defendant's possession of a gun at the time of his arrest. Failure to object to an allegedly improper closing argument or raise the issue in a post-trial motion constitutes waiver of the issue on appeal absent plain error. (*People v. Odle* (1988), 128 Ill. 2d 111, 133-34, 538 N.E.2d 428.) Plain error may be considered only in cases where the evidence is closely balanced (*People v. Gacho* (1988), 122 Ill. 2d 221, 239, 522 N.E.2d 1146); the evidence of defendant's guilt in the present case is overwhelming. Considering the one comment which was not waived, defendant was not denied a fair and impartial trial, for the jury would have reached the same result absent any of the remarks. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68.) All statements relating to defendant's arrest for possession of a gun were proper to demonstrate defendant's identity. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840.) Each comment raised was either based on a reasonable inference drawn from the facts in evidence (*People v. Franklin* (1990), 135 Ill. 2d 78, 100, 552 N.E.2d 743), invited by defense counsel's argument (*People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180), or served to discredit defense counsel's argument (*People v. Phillips* (1989), 127 Ill. 2d. 499, 526, 538 N.E.2d 500). Such comments do not constitute reversible error.

In light of the overwhelming evidence of defendant's guilt, the prosecutor's utterances could not have affected the verdict. The court instructed the jury also that argument is not evidence and that argument not based on the evidence should be disregarded. (*People v.*

*Scott* (1990), 194 Ill. App. 3d 634, 644, 551 N.E.2d 288; *Witted,* 79 Ill. App. 3d at 165.) There are no bases for disturbing the jury's verdict in this regard.

## IV

Defendant asserts he was wrongfully sentenced to life imprisonment because the State failed to prove his two prior Class X felony convictions beyond a reasonable doubt.

The Habitual Criminal Act (Ill. Rev. Stat. 1989, ch. 38, par. 33B—1 *et seq.*) provides a sentence of life for individuals convicted of three Class X felonies within a 20-year period. The State must prove the material allegations in its petition beyond a reasonable doubt. *People v. Davis* (1990), 205 Ill. App. 3d 865, 872, 563 N.E.2d 869.

Certified copies of conviction statements demonstrating defendant's prior criminal record are *prima facie* evidence of that record, but are not alone adequate to meet the burden of proof. (*People v. Gill* (1988), 169 Ill. App. 3d 1049, 523 N.E.2d 1239.) There must be evidence that the person named in the record and defendant are identical. *Gill,* 169 Ill. App. 3d at 1057.

The State submitted two certified copies of conviction statements. The first copy contains defendant's name, raising a rebuttable presumption that it identifies defendant. (*People v. Davis* (1983), 95 Ill. 2d 1, 31, 447 N.E.2d 353.) Defendant claims that this presumption was successfully rebutted.

■ Regarding the first conviction, the statement lists the indictment date as February 27, 1976, and the arraignment date as March 14, 1975, an impossibility because an indictment takes place before an arraignment. All other dates are marked within the year 1975, however, including the conviction date, which could not have occurred before the erroneous 1976 date of indictment. As the State argued, the error was typographical. Second, defendant asserts the presumption was rebutted because the State's petition to sentence defendant to life imprisonment lists November 21, 1975, as the date defendant pled guilty; however, a different date, November 17, 1975, is listed on the conviction statement. The State produced witnesses who made in-court identifications of defendant, including the assistant State's Attorney who prosecuted him and the officer who arrested him for the 1975 offense. The State proved beyond a reasonable doubt that defendant was the person previously convicted.

As to the second conviction, defendant argues that the State did not carry its burden, pointing to assertedly contradictory testimony of the State's witnesses.

Lt. Knightly testified that defendant was the person he saw commit a robbery and shoot a gun at him in 1979. At a jury trial, he testified against defendant. A second policeman, Officer Gaiter, identified defendant as the person he apprehended for the robbery in 1979, stated there was a trial, but could not remember whether or not he testified at defendant's trial. A third policeman, Officer Shannon, testified that defendant and a codefendant were arrested on February 28, 1979, and he testified at defendant's trial. The assistant State's Attorney, who prosecuted the trial in question, testified that defendant pled guilty and a codefendant was found guilty by a jury on the same offenses.

Defendant interprets this testimony as leaving doubt about his identity as the one previously convicted. Although there may be a question as to how defendant was convicted, all three officers identified defendant in court, asserting that they witnessed his arrest on February 28, 1979. The assistant State's Attorney correctly testified that defendant pled guilty. There were two offenders. One pled guilty; the other was found guilty. This explains any ambiguity raised by the officers' memories as to how defendant was convicted. The State has proved defendant was previously convicted of the alleged acts beyond a reasonable doubt. *Davis*, 205 Ill. App. 3d at 872.

■ Lastly, defendant urges that the double jeopardy clauses of the United States and Illinois Constitutions preclude his resentencing as an habitual offender, relying on *Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852, where the Court held that the protection of the double jeopardy clause is extended to defendants with respect to death penalty retrials. (*Bullington*, 451 U.S. at 446, 68 L. Ed. 2d at 283-84, 101 S. Ct. at 1862.) We need not reach this issue, however, since the evidence presented by the State properly proved only that defendant here was the same person previously convicted of the two Class X felonies within a 20-year period.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.