FOURTH DIVISION

December 11, 1997

No. 1-95-3863

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT OF 

Plaintiff-Appellee, ) COOK COUNTY.

)

v. ) 

)

NORMAN STOKES, ) THE HONORABLE

) THEMIS KARNEZIS,

Defendant-Appellant. ) JUDGE PRESIDING.

JUSTICE SOUTH delivered the opinion of the court:

Norman Stokes and Charles Lawrence were charged by indictment with attempted first degree murder, armed robbery, home invasion, aggravated battery, and armed violence.   The State nolle-prossed the aggravated battery and armed violence counts.  Defendants were found guilty on the charges of attempted first degree murder, armed robbery and home invasion.  The court sentenced Stokes and Lawrence to 15 years imprisonment to be served concurrently on each count.  Stokes appeals from this judgment.

On October 5, 1994, defendant's case was called for jury trial.  Neither defendant nor his attorney were present and the assistant State's Attorney informed the court that defendant was incarcerated in the 7th District from an incident that occurred the night before, but he was I-bonded over and directed to be in court.  The judge passed the case.  When the case was recalled, defendant's attorney represented that defendant was in route, that he had been released from the 7th District at 9:30 a.m., and that his mother was bringing him to court as soon as possible.  The judge indicated that he would wait for defendant, and the case was passed again.  

At approximately 11:15 a.m., the court swore in the 
voir
 
dire
 panel without any defense attorneys or defendant being present.  A recess was taken after the court informed the panel that "we are waiting for everybody to arrive.  I expect them any moment.  In fact they are a little late now.  As soon as everybody has arrived we will begin promptly."  

During the recess, the court stated on the record that counsel for Lawrence and defendant Lawrence arrived at 11:44 a.m.  At 11:55 a.m., the court discovered that Stokes' attorney had left the building.  The court fined him $1000 in direct contempt for delaying the trial approximately 45 minutes.  

When the trial resumed, both defense attorneys were present, but Stokes had not arrived.  The court informed the prospective jurors:

"Regarding Mr. Stokes he is in route is my understanding.  I wanted to get started.  He will be with us momentarily but I will get into that also in a moment."  

The court proceeded to conduct 22 
voir
 
dire
 examinations outside of defendant's presence.  Defense counsel exercised five preemptory challenges before defendant arrived.  The State challenged six prospective jurors, and two jurors were excused for cause by the court.  The judge then stated on the record that defendant had arrived, but he did not state a time.  Defense counsel never objected to the court proceeding with trial in defendant's absence.

On the evening of February 10, 1994, Derrick Williams, who had previously been convicted of burglary, was in his home at 2417 West 70th Street. Williams lived in the west apartment on the second floor with his girlfriend Shariba Riley, and his friends Carl Henderson and Fletch.   At 10 p.m., Williams, Shariba, Carl, Tyrone, Fletch and a friend named Juice were in the apartment.  Williams, Shariba and Tyrone were in the bedroom and Carl, Fletch and Juice were in the living room.  Everyone was drinking beer, and Williams was smoking marijuana.  As Williams sat in the bedroom, he heard a loud "boom" and someone say, "stickup."  When Williams heard "stickup," he tried to hide his money in a couch in the bedroom.  He then looked out the bedroom door and saw a tall man wearing a beige coat holding a silver pistol and a short man holding a sawed-off shotgun enter the apartment.  These men entered the bedroom which was illuminated with an electric light and candles.  The man with the shotgun left the bedroom, and the other man waved a gun and told everyone to get on the floor.  Williams did not get on the floor but went toward the man with the gun.  The man grabbed Williams causing him to fall over a table and to the floor.  This man grabbed Williams by the neck and fired twice.  One bullet struck Williams in the head.  He felt a sting, passed out and then revived.  He never completely lost consciousness.  After the shots, the men ran out the back door.  

Williams left the apartment through the front door and went to the corner of 70th and Western Avenue.  The police and an ambulance came to the scene, and Williams was taken to the hospital where the bullet was surgically removed from his head.   After the incident, Williams discovered he had $100 missing from his pocket.  Williams did not know who took his money because he passed out for a second after he was shot.  He could only say that it was the tall man who shot him. The short man had Juice and Fletcher on the living room floor and placed Henderson in the bathroom with the door shut. 

At a lineup conducted a few days later, Williams could not positively identify either defendant.  Shariba identified the short man with the sawed-off shotgun as Charles Lawrence, while Henderson identified both Lawrence and Stokes at the lineup.  

Upon arriving at the scene, Officer Carson Earnest saw defendants running next to the apartment building holding a sawed-off shotgun and a revolver.  Earnest and his partner, Officer Jaritz, pursued defendants.  Earnest noticed defendant Stokes was bleeding from his left hand, and that his light pants were stained in blood.  After seeing defendants discard their weapons, the officers left their squad car and chased them on foot.  The officers never lost sight of defendants during this chase.  Jaritz apprehended Stokes, and Lawrence was apprehended by another officer.  Defendant was admitted to the hospital with a gunshot wound to his left thumb.  

The police recovered a 410 sawed-off shotgun, a five-shot .38 silver nickel type colored revolver and five rounds from the revolver, two of which had been expended.  During a custodial search of Stokes, police recovered two rounds in his hip pocket which were similar to the rounds found inside the weapon. 

Williams, Shariba, Henderson, and Fletcher stated that they lived in the apartment.  However, Williams informed hospital personnel that his address was on South Campbell, which was his sister's address.  He stated that he received mail both at his sister's home and at the 70th Street apartment.  Shariba testified that she lived at the 70th Street apartment with Williams, Henderson and Fletcher.  On cross-examination, she admitted that she lived with her grandmother on South Damen.  

No one had a lease to the apartment, which lacked a stove, a bed and gas.  The bedroom contained a couch, television table, lamp and two candles.  According to Shariba, the couch let out to a bed.  There were two candles in the living room.  While Shariba stated that the kitchen housed a table, sink and refrigerator, Henderson stated that there was no refrigerator.  The electricity, which was in the landlord's name, functioned only after 6 p.m. by running off a socket in the hallway.  

During the preliminary hearing, the court granted defendants' motion 
in limine
 to bar any mention that defendants were gang members or any indication of a gang war.  The State agreed, adding that they "weren't planning on introducing anything."  On Lawrence's cross-examination, the State asked him, "[i]sn't it true that you told the detectives that they were your gang friends?"  Defense counsel immediately moved for a mistrial following this question, and the judge overruled the objection.   Lawrence denied that he had gang friends and admitted to visiting with friends prior to going to the apartment. 

The State called Detective William Moser as a rebuttal witness.  Moser testified that Lawrence told him he was a member of the Gangster Disciples street gang.  He added that Lawrence told him he went to the apartment to purchase cocaine.  

At the close of its case, the State nolle-prossed all charges except attempted first degree murder, armed robbery and home invasion.  The jury found defendants guilty on all three charges.  The court sentenced defendants to 15 concurrent years imprisonment.
 

Defendant first contends that he was denied a fair trial due to the numerous comments made by the judge in the presence of the jury.  The State maintains that defendant received a fair trial, and that defendant has failed to prove that the remarks made by the judge were prejudicial and that he was harmed by them.  
People v. 
Westfield
, 207 Ill. App. 3d 772, 586 N.E.2d 392 (1990).

Illinois courts have long upheld the right of an accused to a fair and impartial trial by jury, free from influence or intimidation by the trial court.  
People v. Mitchell
, 228 Ill. App. 3d 167, 169, 592 N.E.2d 175, 177 (1992).  Every defendant, regardless of the nature of the proof against him or her, is entitled to a trial that is free from improper and prejudicial comments on the part of the trial judge.  
People v. Heidorn
, 114 Ill. App. 3d 933, 936, 449 N.E.2d 568, 572 (1983).  The remarks and conduct of the court in the presence of the jury demonstrating that his attitude toward defense counsel was one of impatience and hostility prevented defendant from receiving a fair trial.  
People v. Kelley
, 29 Ill. 2d 53, 193 N.E.2d 21 (1963).  Comments by a court do not require reversal unless they are prejudicial and harm defendant.  The verdict will not be disturbed unless the court's remarks constitute a material factor in the conviction or unless prejudice to defendant appears to be their probable result.  
People v. Walker
, 228 Ill. App. 3d 76, 83, 592 N.E.2d 1, 6 (1992).

In the case at bar, the judge displayed bias against the defense in numerous ways.  During defense counsel's cross- examination of Henderson, the court interrupted complaining that the cross-examination was driving him "crazy."  The judge also stated that maybe he could do a better job than defense counsel.  The court made the following comment to defense counsel in the presence of the jury:

"I don't know.  I don't know.  Thank [g]od.

I mean the jury has to try to figure this

all out somehow but we will get through

it one way or the other.  We have allies

[sic], cleaners, and all sorts of stuff.

You know, I am wondering what the relevance 

is of where these guys are.  What difference

does it make?"  

Later during defense's cross-examination, the judge exclaimed, "[t]his is unbelievable, isn't it? Unbelievable.  Go ahead.  Pose your questions."  During defense counsel's cross-exmination of Officer Earnest, the judge stated:  "I don't know where we are going.  I am telling you something right now, ladies and gentlemen, when and if this is not tied up, all this stuff you can ignore."  The court continued:  "Kind of like some of the other stuff you heard that was not tied up.  That you can ignore, too."  The court asked defense counsel:  "[y]ou are not going to start crying are you Mr. Fay?"  The judge also characterized defense counsel's posing of questions as unartful. 

Clearly, all of these remarks belittled defense counsel and communicated to the jury the judge's opinion of defense counsel and the case.  While any one set of these judicial remarks would not be enough to create prejudice and bias, the cumulative effect of these remarks denied defendant the fair trial to which he is entitled.  
Mitchell
, 228 Ill. App. 3d at 169, 592 N.E.2d at 178; 
People v. Albanese
, 102 Ill. 2d 54, 82-83, 464 N.E.2d 206, 220 (1964).  For this reason, we reverse this conviction and remand the cause for a new trial.

Because of the conclusion we have reached, we address defendant's remaining contentions only for the guidance of the parties.

Defendant contends that he was denied a fair trial under the state and federal constitutions because he was not present for most of his 
voir
 
dire
.  The State contends that defendant's absence from a part of 
voir
 
dire
 did not have an effect on the impartiality of the jury selected.

Under the State Constitution, defendant's right to be present at trial is not absolute.  Rather, defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.  
People v. Starks
, 287 Ill. App. 3d 1035, 679 N.E.2d 764 (1997); 
People v. 
Jones
, 269 Ill. App. 3d 925, 647 N.E.2d 612 (1995).  Under the State Constitution, jury selection is a critical stage of trial, at which defendant has the right to be present.  
People v. Bean
, 137 Ill. 2d 65, 84, 560 N.E.2d 258 (1990). 

In the instant case, defendant was not present during 22 out of 31 individual 
voir
 
dire
 sessions.  Defendant had been incarcerated on a separate charge the night before and was released at 9:30 a.m. on the day of trial.  The court was aware of this fact and passed the case twice.  However, at 11:15 a.m. without defense counsel and defendants being present, the court swore in a panel. Within the hour, the court proceeded to conduct 
voir
 
dire
.

The court was aware that defendant was in route, and defendant did arrive before jury selection was completed.  The State, contrary to its assertion, never proved that Stokes was willfully absenting himself from trial, thus leading to a trial 
in
 
absentia
.  The court should have waited to proceed with jury selection after the State had established that defendant was willfully absent.

Defendant next asserts that he was not proven guilty of attempted first degree murder, armed robbery and home invasion beyond a reasonable doubt.

When presented with a challenge to the sufficiency of the evidence, it is the reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury saw and heard the witnesses.  
People v. Bailey
, 265 Ill. App. 3d 262, 271, 638 N.E.2d 192, 198 (1994).  It is not the function of a reviewing court to retry the defendant, but rather, the determination of the credibility of witnesses, the weight to be given their testimony and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact.  
Bailey
, 265 Ill. App. 3d at 272, 638 N.E.2d at 198.

The offense of attempted murder requires the mental state of specific intent to commit murder.  
People v. Jones
, 81 Ill. 2d 1, 405 N.E.2d 343 (1979).  The necessary specific intent to kill for attempted murder may be shown by surrounding circumstances, including the character of the assault and the use of a deadly weapon.  
People v. Hill
, 276 Ill. App. 3d 683, 658 N.E.2d 1294 (1995).  Specific intent could be inferred in an attempt murder prosecution from defendant's use of a gun.  
People v. Feyrer
, 269 Ill. App. 3d 734, 646 N.E.2d 1244 (1994).  Firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill.  
People v. Strickland
, 254 Ill. App. 3d 798, 627 N.E.2d 218 (1993).  

The evidence proved defendant's specific intent to kill Williams where, with total disregard for Williams life, he grabbed Williams' neck and shot his gun twice in Williams' direction.  One bullet struck Williams in the back of the head and the second bullet pierced defendant's hand.  To sustain a charge of attempt to murder, it is sufficient to discharge a weapon in the direction of another individual, either with malice or total disregard for human life.  
Bailey
, 265 Ill. App. 3d at 273, 638 N.E.2d at 199.  Thus, defendant was proven guilty of attempted first degree murder beyond a reasonable doubt.

The purpose for which a structure is used, rather than the nature of the structure, determines whether it is a dwelling place.  
People v. Bates
, 108 Ill. 2d 182, 483 N.E.2d 517 (1985).

Defendant contends that since Williams' apartment lacked electricity (prior to 6:00 p.m. and then only from an outlet outside the apartment), gas, a bed, refrigerator and a stove, this could not have been his home.  The evidence, however, showed that Williams was living in the apartment and that a light was on and that a television was in use at the time defendant entered.  For purposes of the home invasion statute, Williams' apartment was a dwelling.

Defendant argues next that he was not proven guilty of armed robbery beyond a reasonable doubt because the State failed to prove that he took money from Williams.  Williams testified that when defendant first entered the apartment, he hid some of his money in the couch but that $100 remained in his pocket.  After the incident, Williams recovered the money from the couch, but the $100 in his pocket was gone.  Williams passed out after defendant shot him in the head.  Williams was in the bedroom with Shariba and Tyrone, either of whom could have taken his money.  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found that the State proved defendant guilty of armed robbery beyond a reasonable doubt.

Defendant argues that he was prejudiced by the lower court's admission of evidence of his codefendant's gang affiliation.

Defendant has waived the opportunity to challenge the court's admission of this testimony.  While defendant objected to this testimony at trial, he did not include this issue in his post-trial motion for a new trial.  Such failure is fatal to the preservation of that issue for review.  
People v. Enoch
, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988).

We reverse defendant's conviction and remand the cause for a new trial.

Reversed and remanded. 

HOFFMAN, P.J., and HARTMAN, J., concur.